UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| - v. - | : | 10 Cr. 895 (PGG) |
| ARMEN KAZARIAN, a/k/a/ “Pzo,” a/k/a/ “Qerop,” | : : | |
| Defendant. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA**


PREET BHARARA
United States Attorney
for the Southern District of New York,
Attorney for the United States of America

JENNIFER E. BURNS
ARLO DEVLIN-BROWN
Assistant United States Attorneys
- Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| - v. - | : | 10 Cr. 895 (PGG) |
| ARMEN KAZARIAN,<br>a/k/a/ “Pzo,”<br>a/k/a/ “Qerop,” | :<br><br>: | |
| Defendant. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA**

The Government respectfully submits this sentencing memorandum in advance of the sentencing of Armen Kazarian (“Kazarian” or “defendant”), which is currently scheduled to take place on February 8, 2013, at 2:00 p.m, and in response to defense counsel’s letter dated January 25, 2013 (“Def. Ltr.”). The defendant seeks a sentence of time served, below the United States Sentencing Guidelines (“Guidelines” or “U.S.S.G.”) range set forth in the Presentence Investigation Report (“PSR”)[1] and below the 30-37 month range stipulated to in the plea agreement (“Plea Agreement”). By contrast, the Government respectfully submits that a substantial sentence is warranted based on all of the factors set forth in 18 U.S.C. § 3553(a).

---

[1] References herein are to the PSR dated January 8, 2013.

## BACKGROUND[2]

On October 13, 2010, the defendant was arrested in the above-captioned case and taken into federal custody. He has been detained since that date. (PSR ¶ 12).

On July 8, 2011, the defendant pleaded guilty before Your Honor to Count One of the Indictment pursuant to the Plea Agreement. (PSR ¶ 6). Pursuant to the Plea Agreement, the parties stipulated to the following Guidelines calculations:

> The applicable Guidelines manual is the November 1, 2010 Guidelines manual.
>
> Pursuant to U.S.S.G. § 2E1.1, the offense level for the racketeering offense charged in Count One of the Indictment is the greater of 19 or the offense level applicable to the underlying racketeering activity.
>
> <u>Racketeering Act - Extortion</u>
>
> The base offense level is 18 pursuant to U.S.S.G. § 2B3.2(a).
>
> Pursuant to U.S.S.G. §§ 2B3.2(b)(2) and 2B3.1(b)(7)(c), there is a 2-level increase because the loss amount, based on the information currently known to the Office, was more than $50,000 but less than $250,000.
>
> The adjusted offense level for the Racketeering Act is 20. Because the offense level for the underlying racketeering activity alleged in Count One is more than 19, the offense level for the racketeering offense is 20.
>
> Pursuant to U.S.S.G. § 3B1.1(c), the base offense level is increased by 2 levels because the defendant was an organizer, leader, or supervisor in a criminal activity.
>
> Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a 2-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a). Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, an additional 1-level

---

[2] In addition to the specific evidence referenced herein, the Government also relies on the offense conduct as set forth in the PSR, specifically paragraphs 35, 39, 45- 47, as well as the defendant's allocution ("Plea Tr.").

> reduction is warranted, pursuant to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

In accordance with the above, the applicable Guidelines offense level was agreed to be 19. The parties further stipulated that the defendant had zero criminal history points and fell within Criminal History Category I. Based upon the calculations set forth above, pursuant to the Plea Agreement, the defendant's stipulated sentencing Guidelines range was agreed to be 30 to 37 months' imprisonment (the "Stipulated Guidelines Range"). (PSR ¶ 7).

The parties agreed that neither a downward nor an upward departure from the Stipulated Guidelines Range set forth above was warranted and neither party would seek any departure or adjustment pursuant to the Guidelines. The parties agreed, however, that either party could seek a sentence outside of the Stipulated Guidelines Range based upon the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a).[3]

During his plea allocution, the defendant stated:

> During the time period charged, I agreed to associate with others in a pattern of what is called racketeering. I am aware that the organization was engaged in a pattern of racketeering through multiple acts of extortion. I participated in a conspiracy to extort a debt in the amount of $100,000 from Varujan Amoryan in the years of 2006 and 2010. These acts were committed by telephone and in person and foreseeably involved a threat of force in order to collect the debt. These acts were committed in furtherance of the association described above.

(Plea Tr. at 25; PSR ¶ 84).

The Probation Department concluded that the applicable Sentencing Guidelines range is

---

[3] The defendant further agreed to forfeit (i) the $3,489.10 in United States currency that was seized from the defendant on October 13, 2010, at the time of his arrest; and (ii) the real property described as 345 Pioneer Drive, Unit 102, Glendale, California. The Government provided defense counsel with a proposed order of forfeiture on January 8, 2013.

51-63 months, based on an offense level of 23 and a Criminal History Category of II. (PSR ¶¶ 95, 134). The Probation Department's calculation differs from the calculation contained in the Plea Agreement in three ways. First, the Probation Department concluded that there should be a two-level enhancement due to "an express or implied threat of death, bodily injury or kidnaping." U.S.S.G. § 2B3.2(b)(1). Second, the Probation Department concluded that a four-level leadership enhancement should apply pursuant to U.S.S.G. § 3B1.1(a) rather than the two-level leadership enhancement stipulated in the Plea Agreement. Finally, the Probation Department concluded that the defendant was in Criminal History Category II rather than Criminal History Category I, as had been stipulated to in connection with the Plea Agreement, based on a drunk driving conviction that was overlooked by the Government when the Plea Agreement was executed. As to the Probation Department's suggested enhancements, however, the Government submits that they do not apply, and that the offense level calculations in the Plea Agreement are correct.

**The Guidelines Calculations**

1. The Two-Level Threat Enhancement Pursuant to U.S.S.G § 2B3.2(b)(1)

The Probation Department applied the two point enhancement under U.S.S.G § 2B3.2(b)(1) which applies if the offense of extortion involved an "express or implied threat of death, bodily injury, or kidnaping." The PSR stated that "[o]ver the life of the offense, the defendant and/or his associates made threats of violence to insure that the hierarchy of the organization was maintained and that appropriate respect was afforded to the defendant." (PSR ¶ 87; 136). The PSR further relies on wiretapped conversations in which threats and violence are discussed. (PSR ¶ 46). However, an equally plausible interpretation of the evidence supports the

conclusion that the calls relied upon do not meet the requirements to apply Section 2B3.2(b)(1).

First, by its language, Section 2B3.2(b)(1) relates to the specific offense conduct – here, extortion - not to the RICO conspiracy generally. The principal extortion scheme alleged by the Government and explicitly admitted to by the defendant in his plea allocution involved strong proof of economic harm. In an intercepted call on July 25, 2010 (Call 4403, line 5353), Vagan Stepanian informed Aleksandr Avetisyan that Varujan Amroyan had bought a "yacht" notwithstanding his debt to Kazarian, and discussed how Kazarian was likely to react. Shortly after, Avetisyan placed a call to Kazarian (Call 4406, line 5353) to inform him of the news. Kazarian directed Avetisyan to "take it [the yacht] out of his hands." This is unmistakably a threat to cause economic harm – to seize property rightfully owned (apparently) by the Amroyan for failure to pay a criminal debt – and thus meets the elements of extortion even absent a physical threat. *See United States v. Taylor*, 92 F.3d 1313, 1335 (2d Cir. 1996) (citing *United States v. Capo,* 817 F.2d 947, 951 (2d Cir.1987) (en banc); *United States v. Penn,* 966 F.2d 55 (2d Cir.1992) (per curiam) (applying § 2B3.2 to case involving economic harm); *see also* U.S.S.G. § 2B3.2, Application Note 2. The sentencing enhancement was not intended to apply to all extortions, which are by their nature coercive, but only those involving "an express or implied threat of death, bodily injury or kidnaping." U.S.S.G. § 2B3.2(b)(1). *Taylor*, 92 F.3d at 1335; *United States v. Jones*, 997 F.2d 967, 969-70 (1st Cir.1993).

Second, while the Probation Department correctly describes calls between Kazarian and co-conspirators discussing threats to be made to others[4] – and while the disturbing nature of

---

[4] The Defense Letter questions the accuracy of the translation by referring to an issue at the initial pretrial conference when an interpreter translating the proceedings did not speak the same Armenian dialect as that of the majority of the defendants. The FBI interpreter

these calls is certainly relevant to the Section 3553(a) analysis – the potential victims of these threats were not located. Accordingly, there is limited evidence that threats were actually conveyed and limited evidence linking the threats to an extortionate scheme.

2. Adjustment for Role Pursuant to U.S.S.G. § 3B1.1(c).

The Government also submits that a two-level role enhancement pursuant to U.S.S.G. § 3B1.1©) is appropriate under the circumstances. As an initial matter, there is no question that the defendant was "an organizer, leader, or supervisor in a criminal activity" and that, accordingly, some level of leadership adjustment is appropriate. As the Probation Department correctly points out, the defendant had an official position in organized crime as a "Vor," collected money from criminal associates (such as Amroyan) for using his criminal position to resolve disputes, and further used his rank to influence the conduct of other co-conspirators (such as directing them to commit violence or seize property). (PSR ¶ 90).

Although the defendant clearly played a leadership role, the four-level enhancement under Section 3B1.1 applies only where the defendant was an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." Here, there is no evidence in the record supporting Kazarian's leadership role involving five or more participants. The wiretapped calls primarily revealed his instructions to co-defendant Avetisyan as well as an unidentified individual named "Davo." While the Mirzoyan-Terdjanian Organization ("MTO") was extensive and involved over 20 individuals, the evidence does not demonstrate the defendant's involvement in all aspects of the scheme; rather, the provable aspect of his conduct

---

translating the wiretap calls did understand the dialect and properly translated the calls, as found by the Court in the Kazarian detention proceedings. (Dec. 23, 2010 Tr. at 21-22).

was more limited, as reflected in the Plea Agreement. Thus when the defendant's formal leadership role is assessed in the context of the particular role he played in the charged offenses, a two-level enhancement is more appropriate. *See United States* v. *Gotti*, 459 F.3d 296, 349 (2d Cir. 2006).

3. <u>The Defendant's Criminal History Category</u>

The defendant's criminal history report, produced to the defense in discovery, included a conviction on or about June 9, 2001, for Driving Under the Influence of Alcohol/Drugs ("DUI"), for which the defendant was sentenced to a term of 36 months' probation, and for which the Probation Department correctly assessed one criminal history point. (PSR ¶ 97). The Probation Department also identified new information about the timing of the conviction that supports the addition of two more criminal history points, raising the criminal history level to Category II. Specifically, as set forth the in the PSR, the defendant failed to appear for a court hearing on the DUI case on August 16, 2001 and a bench warrant was issued. (PSR ¶ 99). The defendant was not returned on the warrant until October 18, 2006. (PSR ¶ 100). At that time the defendant entered a plea of *nolo contendere* and was sentenced to a three-year term of probation. (PSR ¶ 100). An application to terminate the defendant's probation was denied on May 23, 2008. (PSR ¶ 100). A subsequent petition was granted on December 22, 2008. (PSR ¶ 100). Accordingly, the defendant was serving a term of probation from October 18, 2006 through December 22, 2008. The Probation Department thus determined that the defendant was on probation when the instant offense was committed and added two criminal history points. (PSR ¶ 101).

The defendant objects to the inclusion of two points for committing the conduct in this case while on probation based on its view that the defendant's actions preceded and postdated

the term of probation. (Def. Ltr. at 17). However, the defendant plead guilty to committing RICO conspiracy – a continuing offense spanning from 2006 through 2010. Indeed, acts relating to Amroyan alone – first the settlement of the criminal dispute, and then the threat to seize his boat for failing to pay the defendant for settling that dispute – spanned from 2006 to 2010. On top of this, the defendant pled guilty to a RICO conspiracy, and his membership in that conspiracy is presumed to have continued until the conspiracy ended (with the arrests in October 2010), with the burden on the defendant to prove withdrawal. *See, e.g., United States v. Yannotti,* 541 F. 2d 112, 123 (2d Cir. 2008) (finding that once the Government meets its burden of proof to establish a RICO conspiracy, "it is entitled to a presumption that the conspiracy continued until [the] defendant demonstrate[s] otherwise" ). Indeed, the wiretap interceptions show that the defendant remained involved in the conspiracy until its conclusion.

In the alternative, the defendant seeks a downward departure of three levels under Section 4A1.3(b)(2)(A) on the grounds that his Criminal History category overstates the seriousness of the offense. Under the terms of the Plea Agreement, this argument is prohibited. But whether this request is considered in downward departure terms or under Section 3553(a), it has little force. The fact that the defendant drove while under the influence in 2001 is not what led to the increase in Criminal History level from Category I to Category II; the conviction itself added only a single point, which would have left the Criminal History unchanged. What added to the defendant's criminal history was his failure to appear in court in 2001, which resulted in a sentence not being imposed until 2006 and a term of probation that likely would have been longer than had the defendant appeared and resolved the case in 2001. That the defendant would then participate in a racketeering conspiracy while on probation represents further significant

and unlawful conduct and thus warrants the inclusion of further criminal history points. In any event, as discussed below, even if the nature of the defendant's criminal history is offered as a factor in his favor in the 3553(a) analysis, a host of other 3553(a) factors support a significant sentence.

**Discussion**

The Government submits that when all of the § 3553(a) factors are considered, a significant sentence is warranted.

As an initial matter, the Guidelines provide an important starting point in the § 3553(a) analysis. From a categorical perspective, the Guidelines range that applies in this case reflects the considered judgment of the Sentencing Commission, after examining "tens of thousands of sentences and work[ing] with the help of many others in the law enforcement community over a long period of time" in an effort to fulfill the same objectives set out in Section 3553(a). *Rita* v. *United States*, 541 U.S. 338, 349 (2007). The Guidelines "seek to embody the § 3553(a) considerations, both in principle and in practice," and accordingly, the guidelines "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Id.*

Second, the nature of the offense – a widespread and far-reaching racketeering conspiracy involved in massive fraud and extortion – is unquestionably deeply serious. This criminal enterprise committed what may be the largest Medicare fraud scheme ever perpetrated by a single group, a scheme that involved identify theft, bank fraud and money laundering on a massive and well-organized scale in addition to the underlying health care fraud. The defendant is of course correct that he did not plead guilty to participating in the Medicare fraud scheme, and the Government cannot prove that he did so. But what the defendant ignores in advancing

this argument is that this limited role is precisely accounted for under the Guidelines. The Guidelines calculation is based solely on the defendant's admitted extortionate conduct, and the Medicare fraud losses that have led to 10-year plus Guidelines ranges for other defendants, such as Davit Mirzoyan, play no role in the calculation here. Indeed, if anything, the Guidelines understate the seriousness of the offense, holding the defendant responsible only for extortion involving modest amounts and no threats. But Kazarian's position a "Vor" and the role he played in resolving disputes among criminals is critical to the organized crime system that allowed the MTO to maintain discipline and flourish. Thus the substantial damage caused by the MTO as a whole should be part of the analysis as to the appropriate sentence.

The defendant's selective reference to sentences imposed on other defendants add little to this analysis, because those sentences were calibrated to the particular facts and circumstances of those defendants. For example, while Stepanian and Avetisyan both faced a 30-37 month Guidelines range (with Stepanian being sentenced to 30 months' imprisonment and Avetisyan 37), those defendants, unlike Kazarian, did not play a leadership role. The defendant also points to co-defendants Amroyan, Karen Simonian and Karen Aharonian. (Def. Ltr. at 24). Comparisons to those defendants fail. While all of those defendants plead guilty to the RICO conspiracy, their conduct was quite different from Kazarian's. Amroyan's conduct related to access device fraud – not extortion – and he was credited with a two point role reduction. Similarly Aharonian's racketeering activity also related to access device fraud and he was given a two point role reduction. Thus those defendants are not comparable. Simonian, who plead guilty to participating in the health care fraud scheme, faced a Guidelines range higher than that faced by Kazarian but received a reduction in sentence based in part on his unique family

circumstances – circumstances not present here.

Indeed, the defendant's personal history and characteristics here reflect the need for a significant sentence. While the defense points to the fact that this is the defendant's first felony conviction, the record reflects deeply suspicious conduct since his entry into the United States and is devoid of evidence of legitimate employment. As the Court found in granting the Government's detention application, after considering multiple rounds of briefing and evidence presented in multiple hearings, the defendant "has not demonstrated any lawful employment" and "[t]he evidence before the Court concerning Mr. Kazarian's financial condition is extremely troubling." (Dec. 23, 2010 Tr. at 25). Despite reporting a negative monthly cash flow to Pretrial Services, the defendant owned a home worth nearly $600,0000 with no mortgage, drove a Rolls Royce Phantom worth about $150,000, and gambled over $1,000,000 at the Wynn Casino in Las Vegas over four years, and had an account at Bank of America through which approximately $120,000 passed. As the Court found then – and is just as clear now with the benefit of the PSR – explanations for the defendant's unexplained wealth and assets "are not credible." (*Id.*). Indeed, the defendant's negative personal history extends back to his entry into the United States because, as the Court previously found, "there is substantial evidence that [the defendant] obtained asylum through fraud." (*Id.* at 30).

This history is significant to sentencing in two ways. First, it points to the absence of legitimate ties to or conduct in the United States. Instead, as reflected in the intercepted calls referred to in the PSR and in prior proceedings, Kazarian appears to have lived in the United States while profiting off of the criminal activity of others, and using a position that brought him fear and respect to resolve disputes among criminals. Second, the defendant's explanations for

this history suggests a willingness to present false information in proceedings in this Court. As the Court observed in connection with bail proceedings, the various explanations the defendant offered both as to assets and as to his asylum application were not credible. (*Id.* at 27, 31).[5]

Considered together, the offense conduct and the history and characteristics of the defendant call for a significant sentence in order to provide a just punishment, protect the public from the defendant, and to provide both specific and general deterrence.

Dated: New York, New York
February 1, 2013

Respectfully submitted,

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
of America

By: _/s/ Jennifer E. Burns_____________
JENNIFER E. BURNS
ARLO DEVLIN BROWN
Assistant United States Attorneys
(212) 637-2315/2560

---

[5] Indeed, the defendant's explanations as to his immigration background continue to evolve, with the defendant reporting to Probation that in 1988 he fled to Armenia and stayed for six months prior to moving to Moscow. However, during prior bail proceedings in this court, Kazarian reported living in Armenia for four years before going to Moscow. (PSR ¶ 109).

AFFIRMATION OF SERVICE

JENNIFER E. BURNS, pursuant to Title 28, United States Code, Section 1746, hereby declares under the penalty of perjury:

That I am an Assistant United States Attorney in the Office of the United States Attorney for the Southern District of New York.

That on February 1, 2013, I caused one copy of the within Sentencing Memorandum to be served by e-mail on:

Mark Geragos, Esq. at mark@geragos.com

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: New York, New York
February 1, 2013

___/s/____________________
JENNIFER E. BURNS